SHOSHONE–BANNOCK TRIBES OF
THE FORT HALL RESERVATION,
Plaintiff,

v.

Donna E. SHALALA, Secretary of the
United States Health and Human Ser-
vices; Michael H. Turjillo, Director of
the Indian Health Service, United States
Department of Health and Human Ser-
vices; Douglas Black, Director of Office
of Tribal Activities, Indian Health Ser-
vice; James R. Floyd, Portland Area Di-
rector, Indian Health Service, United
States Department of Health and Hu-
man Services, Defendants.

No. CV–96–459–ST.

United States District Court,
D. Oregon.

Dec. 12, 1997.

Lori Irish Bauman, Ater Wynne Hewitt Dodson & Skerritt, Portland, OR, Lloyd Benton Miller, James E Glaze, Sonosky Chambers Sachse Miller & Munson, P.C., Anchorage, AK, for Shoshone–Bannock Tribes of the Fort Hall Reservation.

Kristine Olson, U.S. Atty.'s Office, Portland, OR, Daniel Bensing, U.S. Dept. of Justice, Civil Div., Washington, DC, Sheila M Lieber, U.S. Dept. of Justice, Civil Div.–Fed. Prog. Branch, Washington, DC, for Secretary Department of Health and Human Services.

Kristine Olson, U.S. Atty.'s Office, Portland, OR, Daniel Bensing, U.S. Dept. of Justice, Civil Div., Washington, DC, Sheila M Lieber, U.S. Dept. of Justice, Civil Div.–Fed. Prog. Branch, Washington, DC, Eric Mahr, U.S. Dept. of Justice, Washington, DC, Sheila M Lieber, Washington, DC, for Indian Health Services.

Kristine Olson, U.S. Atty.'s Office, Portland, OR, Daniel Bensing, U.S. Dept. of Justice, Civil Div., Washington, DC, for Michael H Trujillo.

## OPINION

STEWART, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff, Shoshone–Bannock Tribes of the Fort Hall Reservation ("Shoshone–Bannock Tribes"), is a federally recognized "tribal organization" under the Indian Self–Determination and Education Assistance Act, as amended, 25 U.S.C. §§ 450a–450n ("IS-DEA"), with tribal headquarters located in Fort Hall, Idaho. The Complaint contains ten claims for relief for declaratory and injunctive relief and monetary damages based on violations of various provisions of the IS-DEA by the following defendants:

> Donna E. Shalala, Secretary of the United States Department of Health and Human Services ("HHS") ("Secretary");
>
> Michael H. Trujillo, Director, Indian Health Service ("IHS");
>
> Douglas Black, IHS Director of Office of Tribal Activities; and
>
> James R. Floyd, former IHS Portland Area Director.[1]

The alleged violations concern the allocation and timing of release of funds by IHS to the Shoshone–Bannock Tribes for the operation of certain health care services for fiscal year ending September 30, 1996 ("FY 1996").

This court has jurisdiction pursuant to 25 U.S.C. § 450m–1(a) and 28 U.S.C. § 1331. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c).

Now before this court are the Shoshone–Bannock Tribes' Motion for Partial Summary Judgment (docket # 30) and defendants' cross Motion for Summary Judgment (docket # 37). The Shoshone–Bannock Tribes have agreed to dismiss without prejudice their First and Second Claims (concerning the Fort Hall Service Unit administrative shares) because they are moot and the Third and Fifth Claims (concerning the adjusted 70/30 formula to allocate funds and the Fort Hall Service Unit Transitional Amount) because they are not yet ripe. Thus, the cross-mo-

---

**1.** The Acting IHS Portland Area Director is now · Joyce Reyes.

tions for summary judgment are directed at the six remaining claims.

For the reasons that follow, the parties' motions are granted in part and denied in part.

## II. *UNDISPUTED FACTS*

Although no party submitted a concise statement of material facts in support of its summary judgment motion, as required under Local Rule 220–9(a), the bulk of facts surrounding this dispute as alleged in the Complaint either are admitted in the Answer or are treated as undisputed in the parties' submissions. The undisputed facts are as follows:

### A. *IHS Organization*

IHS, a part of HHS, provides or funds a wide array of inpatient, outpatient, community health and other health care services for the benefit of approximately 1.2 million American Indians and Alaska Natives throughout the United States, including the Shoshone–Bannock Tribes. IHS has three administrative levels which service the Shoshone–Bannock Tribes: (1) the Headquarters Office located primarily in Rockville, Maryland, which manages 12 Area Offices; (2) the Portland Area Office for Idaho, Washington, and Oregon located in Portland, Oregon, which services 41 tribes; and (3) the local Fort Hall Service Unit located in Fort Hall, Idaho, which directly services the Shoshone–Bannock Tribes.

### B. *ISDEA*

#### 1. *Title I Contracting Process*

In 1975, Congress adopted the ISDEA. This law shifted control over federal programs serving tribes from IHS to the tribes themselves. The primary means for this transfer is the Title I contracting process. Title I directs the Secretary, at the request of any tribe or tribal organization, to enter into a "self-determination contract" to "plan, conduct and administer" any IHS program. 25 U.S.C. § 450f(a)(1). Title I governs the process from the initial proposal through to IHS' funding and oversight of the program after a contract is approved.

Within 90 days after receipt of a contract proposal from a tribal organization, the Sec-

retary must award a contract under Title I "unless the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates" that one of the following five specific declination criteria applies:

(A) the service to be rendered to the Indian beneficiaries of the particular program or function to be contracted will not be satisfactory;

(B) adequate protection of trust resources is not assured;

(C) the proposed project or function to be contracted cannot be properly completed or maintained by the proposed contract;

(D) the amount of funds proposed under the contract is in excess of the applicable funding level for the contract, as determined under section 450j–1(a) of this title; or

(E) the program, function, service, or activity ... that is the subject of the proposal ... includes activities that cannot lawfully be carried out by the contractor.

25 U.S.C. § 450f(a)(2).

If the Secretary declines to enter into a self-determination contract, she must "state any objections in writing," "provide assistance to the tribal organization to overcome the stated objections," and allow a "hearing on the record" with "full discovery" and "the opportunity to appeal." 25 U.S.C. § 450f(b). Although the Secretary may partially decline a contract proposal that "proposes in part to plan, conduct, or administer a program, function, service, or activity that is beyond the scope of programs covered" by Title I or "proposes a level of funding that is in excess of the applicable level," she nonetheless "shall approve any severable portion of a contract proposal that does not support a declination finding." 25 U.S.C. § 450f(a)(4).

#### 2. *Funding*

The ISDEA requires that funding for a self-determination contract "shall not be less than the appropriate Secretary would have otherwise provided for the operation of the programs" covered by the contract. 25 U.S.C. § 450j–1(a)(1). This is commonly referred to as the "Secretarial Amount." The ISDEA forbids the Secretary from reducing

the amount of funding for virtually any reason except a reduction in appropriations or tribal authorization:

> Notwithstanding any other provision in this Act, the provision of funds under this Act is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this Act.

25 U.S.C. § 450j–1(b).

Until 1988, the Secretarial Amount only included funds for the direct operation of health care programs. Although a tribe contracted to operate a particular program at the Service Unit level, IHS maintained its administrative operations at the Area and Headquarters levels. However, subsequent amendments to the ISDEA broadened the scope of self-determination contracts.

In 1988, Congress added Title III to the ISDEA which permits tribes to take over comprehensive responsibility to plan, conduct, consolidate, administer, and even redesign all health care programs, services and functions previously provided by IHS. Title III compacts are funded by Annual Funding Agreements. The 1988 amendments also required the Secretary to provide "contract support costs" to cover administrative overhead and other specified indirect costs associated with a particular program under a self-determination contract. 25 U.S.C. § 450j–1(a)(2). In addition, a new provision conferred jurisdiction on the federal district courts over any civil action or claim under the ISDEA. 25 U.S.C. § 450m–1(a).

In October 1994, Congress enacted additional amendments known as the Indian Self-Determination Contract Reform Act of 1994, Title I, Public Law 103–413. Among other changes, those amendments enabled tribes to contract with IHS to take over IHS Area Office and Headquarters Office administrative functions for the Service Unit programs which they have contracted to operate. 25 U.S.C. § 450j–1(a)(1). Because IHS's administrative components support all IHS health care programs and all tribes, a tribe may take over only that portion of the administrative components supporting the particular Service Unit program for which the tribe has contracted to operate. That

amount is referred to as the "tribal share." Consequently, the "Secretarial Amount" now includes both funds for operation of a particular program, as well as any connected tribal share, i.e. the Area and Headquarters administrative functions that support the program. The 1994 amendments also extensively detailed the types of contract support costs that must be paid. 25 U.S.C. § 450j–1(a)(2), (3) and (5).

### 3. Self–Determination by the Shoshone– Bannock Tribes

Since October 1980, pursuant to the ISDEA, the Shoshone–Bannock Tribes have operated certain IHS-funded tribal community health-care programs of the Fort Hall Reservation under one or more self-determination contracts. As of early 1995, these services included mental health services, the community health representative program, various alcohol treatment programs, the maternal child health program, and other similar community outreach programs. IHS retained certain other administrative programs, such as the Medical Records Department and Quality Assurance/Quality Improvement services. IHS also directly administered the Public Health Nursing ("PHN") program and the Not–So–Gah–Nee Clinic, and operated other direct and administrative programs benefitting the Shoshone–Bannock Tribes from the Portland Area Office and Headquarters.

This lawsuit involves two contract proposals submitted by the Shoshone–Bannock Tribes to the IHS Portland Area Office in mid–1995 to increase the scope of the tribes' self-determination contracting and assume their tribal share of the Secretarial Amount. These proposals were negotiated and awarded in part, and declined in part, in late 1995.

### C. PHN Proposal

On April 26, 1995, the Shoshone–Bannock Tribes transmitted Resolution No. HTWF–95–0236 (the "PHN Proposal") to the IHS Portland Area Office, proposing that the Shoshone–Bannock Tribes assume the PHN program, together with the Secretarial Amount supporting that program at the Service Unit, Area and Headquarters levels. IHS approved the proposal to run the PHN pro-

gram, but not the level of funding proposed for the tribal share of the Secretarial Amount.

The statutory approval/declination period, as extended by the parties, expired on September 15, 1995. IHS never issued a written declination decision, and has not yet paid any portion of the Secretarial Amount for the Fort Hall Service Unit level for the PHN program to the Shoshone–Bannock Tribes.[2]

On November 6, 1995, the Shoshone–Bannock Tribes notified IHS in writing of their intent to sue under 25 U.S.C. § 450m–1(a) "to compel the Secretary to award and fund" the Service Unit portion of the Secretarial Amount of the PHN Proposal.

### D. *Tribal Shares Contract Proposal*

On July 11, 1995, the Shoshone–Bannock Tribes adopted Tribal Counsel Resolution No. CTRT–95–0627 (the "Tribal Shares Contract Proposal"), proposing that they operate all administrative functions at the Area and Headquarters levels associated with or supporting all local community health care programs previously contracted by them. By agreement of the parties, this Tribal Shares Contract Proposal was combined with the comparable portion of the PHN Proposal and negotiated together.

In negotiations during November 1995, the Shoshone–Bannock Tribes and IHS reached agreement on the various budget lines and associated functions covered by the Tribal Shares Contract Proposal. However, IHS rejected the Shoshone–Bannock Tribes' proposal regarding: (1) the amount of funds available for contracting at the Portland Area Office level; (2) the methodology for determining the tribal share of the Portland Area Office funds; and (3) the amount to be actually awarded and paid as the tribal share for various Area Office and Headquarters functions. IHS also determined not to immediately pay any contract support costs.

On November 29, 1995, IHS issued a "Partial Declination Letter" of the Tribal Shares Contract Proposal. The IHS Decision declined to fund the proposal at the full amount pursuant to the proposed timetable, and in-

stead agreed to fund only 20% of the tribal share for the Portland Area Office for FY 1996. This decision was based on a "Release Plan" developed by the Area Office to match the pace at which it elected to make tribal shares of its administrative functions available in FY 1996 and later years for all tribes.

### III. *THE REMAINING CLAIMS*

The Shoshone–Bannock Tribes' remaining six claims challenge four specific actions taken by IHS which affect the amount and timing of the funding which the Shoshone–Bannock Tribes claim are due under the ISDEA for FY 1996.

First, the Shoshone–Bannock Tribes contend that IHS improperly withheld certain funds ("Title I Retained Funds") from the Secretarial Amount for the Portland Area Office in violation of 25 U.S.C. § 450j–1(a) and (b). Complaint, ¶¶ 61–66 (Fourth Cause of Action).

Second, the Shoshone–Bannock Tribes contest the timing of the release of funds under the Portland Area Office "Release Plan." They claim that this denial violates 25 U.S.C. § 450j–1(a) and (g) by not fully funding approved administrative functions (Complaint, ¶¶ 72–74 (Sixth Cause of Action)) and violates 25 U.S.C. § 450k by imposing a nonregulatory requirement relating to self-determination contracting (Complaint, ¶¶ 75–78 (Seventh Cause of Action)).

Third, the Shoshone–Bannock Tribes contend that IHS failed to fully fund the Secretarial Amount for IHS Headquarters' administrative functions in violation of 25 USC §§ 450f(a)(1) and (2) and 450j–1(a) and (g). Complaint, ¶¶ 79–83 (Eighth Cause of Action).

Fourth, the Shoshone–Bannock Tribes contend that IHS failed to pay their contract support costs in violation of 25 USC § 450j–1(a)(2) and (g). Complaint, ¶¶ 84–88 (Ninth Cause of Action) and ¶¶ 89–90 (Tenth Cause of Action).

---

**2.** At this point, the Shoshone–Bannock Tribes are not challenging the tribal share of the Service Unit, but rather are challenging only the tribal share of the Area and Headquarters administrative functions.

## IV. STANDARD OF REVIEW

■ Before addressing the merits of the remaining claims, this court must first determine the threshold issue of the proper standard of review under the ISDEA. The ISDEA, 25 U.S.C. § 450m–1(a),[3] authorizes district courts to exercise jurisdiction over civil actions brought under the ISDEA and to order appropriate relief, but does not provide any standard for review. The parties agree that the issue in this case is whether IHS has exceeded its statutory authority, but disagree as to the appropriate standard of review to resolve that issue.

Defendants contend that the Administrative Procedures Act, 5 U.S.C. §§ 701–706 ("APA"), provides the applicable standard of review. The APA provides that "the reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Shoshone–Bannock Tribes disagree and urge this court to adopt a de novo standard of review.

### A. Applicability of the APA

■ When a statute simply provides for review, without providing any standards, or procedures, the Supreme Court has held that "consideration is to be confined to the administrative record and that no de novo proceeding may be held." *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715, 83 S.Ct. 1409, 1413, 10 L.Ed.2d 652 (1963). Accordingly, "[w]hen a statute authorizes judicial review of agency action without providing standards for that review, we look to the [APA] for guidance." *Sierra Club v. Glickman*, 67 F.3d 90, 96 (5th Cir.1995). This general principle has been applied under a variety of statutes.[4] However, "[i]n most instances, of course, where Congress intends review to be confined to the administrative record, it so indicates, either expressly or by use of a term like 'substantial evidence.'" *Chandler v. Roudebush*, 425 U.S. 840, 862, n. 37, 96 S.Ct. 1949, 1960 n. 37, 48 L.Ed.2d 416 (1976).

The Shoshone–Bannock tribes contend that the APA should not apply because: (1) the use of the phrase "civil action" in § 450m–1(a) contemplates a trial de novo; (2) § 450m–1(a) refers to "original jurisdiction" and not "review" or "appeal;" (3) it is anomalous to obtain full discovery for an ISDEA administrative appeal under 25 U.S.C. § 450f(b)(3), but not in a district court proceeding; (4) the APA bans monetary damages which the ISDEA expressly allows a district court to award; and (5) the legislative history of the ISDEA supports a civil trial, rather than review under the APA.

The only reported case construing § 450m–1(a) held that the allocation of contract support costs by the Secretary of the Department of the Interior among competing tribal applicants was subject to judicial review without addressing what standard of review would apply. *Ramah Navajo Sch.*

3. 25 U.S.C. § 450m–1(a) provides as follows:

The United States district courts shall have original jurisdiction over any civil action or claim against the appropriate Secretary arising under this subchapter and, subject to the provisions of subsection (d) of this section and concurrent with the United States court of Claims, over any civil action or claim against the Secretary for money damages arising under contracts authorized by this subchapter. In an action brought under this paragraph, the district courts may order appropriate relief including money damages, injunctive relief against any action by an officer of the United States or any agency thereof contrary to this subchapter or regulations promulgated thereunder, or mandamus to compel an officer or employee of the United States, or any agency thereof, to perform a duty provided under this subchapter or regulations promulgated here-

under (including immediate injunctive relief to reverse a declination finding under section 450f(a)(2) of this title or to compel the Secretary to award and fund an approved self-determination contract).

4. *Northwest Resource Info. Center v. National Marine Fisheries Service*, 56 F.3d 1060, 1066 (9th Cir.1995) (National Environmental Protection Act); *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993) (Arizona–Idaho Conservation Act); *Tribal Village of Akutan v. Hodel*, 869 F.2d 1185, 1193 (9th Cir.1988), *cert denied* 493 U.S. 873, 110 S.Ct. 204, 107 L.Ed.2d 157 (1989) (Endangered Species Act); *Franklin Sav. Ass'n v. Director, Office of Thrift Supervision*, 934 F.2d 1127, 1137 (10th Cir.1991), *cert denied* 503 U.S. 937, 112 S.Ct. 1475, 117 L.Ed.2d 619 (1992) (FIRREA); *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897 (5th Cir.1983) (Clean Water Act).

*Bd., Inc. v. Babbitt,* 87 F.3d 1338 (D.C.Cir. 1996). Although making several direct references to the APA, *Ramah* did not explicitly state that the APA provides the standard of review. To muddy the waters even further, a footnote suggests that the district court "in its discretion, might choose to hold a hearing" on remand. *Id* at 1341, n. 2. The dissent argued that such an approach "turns principles of administrative law on their head ... because it postures the district court as the primary decision maker rather than as a reviewing court with only limited writ under the APA." *Id* at 1352.

In unreported decisions, two other district courts considering the appropriate standard of review under the ISDEA have rule that the APA standard of review controls. *Yukon–Kuskokwim Health Corp. v. Shalala,* No. A–96–155CV (JWS) (D Alaska, April 15, 1997) (order establishing scope of review) ("*YKHC*"); *California Rural Indian Health Bd. v. Shalala,* No. C–96–3526 (ND Cal, April 24, 1997) (order denying motion to compel discovery) ("*California Health Bd.*"). Addressing the same arguments raised here, both courts concluded that the ISDEA is ambiguous and resolved the ambiguity by applying the presumption against *de novo* review.

The Shoshone–Bannock Tribes argue that both of these decisions are mistaken for three reasons: (1) if ambiguous, the ISDEA must be construed in favor of the tribes; (2) the presumption against *de novo* review should not be applied to unique Indian legislation such as the ISDEA; and (3) Congress clearly intended to enable tribes to pursue a normal civil suit for violation of their statutory rights. This court agrees and declines to follow the lead of its sister courts.

### 1. *Statutory Language*

Section 450m–1(a) of the ISDEA grants district courts "original jurisdiction" over "civil actions" with authorization not only to enjoin or compel agency action, but to "order appropriate relief including money damages." This language is certainly less direct than it might have been if Congress had stated, for example, that "review shall be *de novo*." However, in combination, these three phrases are sufficient to connote the right to *de novo* review.

The phrase "original jurisdiction" has been distinguished from appellate jurisdiction both by Black's Law Dictionary 991 (5th ed.1990) and by Article III, Section 2, clause 2 of the United States Constitution. Because Congress is considered to be generally familiar with the law when it enacts a statute, *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 184, 108 S.Ct. 1704, 1711, 100 L.Ed.2d 158 (1988), it is reasonable to assume that Congress was cognizant of Article III when it enacted the ISDEA. Thus, the term "original jurisdiction" is consistent with the possibility that Congress meant to provide for *de novo* review. However, a court with "original jurisdiction" may exercise essentially appellate powers, as with district court review under the APA, while courts with appellate jurisdiction may conduct *de novo* review, as with appellate review of a district court's conclusions of law. Therefore, very little may be inferred about the standard of review by use of the phrase "original jurisdiction" standing alone.

However, Congress' use of the phrase "civil action" in combination with "original jurisdiction" supports *de novo* review. Congress has often used both terms when vesting jurisdiction in the district courts in matters that typically proceed *de novo, e.g.,* 28 U.S.C. §§ 1331, 1332, 1335, 1337, 1338, 1339, 1340 and 1343, or concurrently in the district courts and the Court of Claims. 5 U.S.C. §§ 8715 and 8912. In addition, the phrase "civil action" has been read by the Supreme Court and the Ninth Circuit in other contexts to require *de novo* review of agency action. In *Chandler,* 425 U.S. at 845, 96 S.Ct. at 1952, the Supreme Court held that under Title VII, federal employees are entitled to the same rights as private-sector employees, namely full discovery and *de novo* review of Civil Service Commission discrimination decisions, explaining:

> The terminology employed by Congress— "assign the case for hearing," "scheduled ... for trial," "finds,"—indicates clearly that the "civil action" to which private-sector employees are entitled under the amended version of Title VII is to be a trial *de novo.*

Similarly in *Nabors v. United States*, 568 F.2d 657, 660 (9th Cir.1978), citing *Chandler*, the Ninth Circuit held that "the language of [the ADEA], 'A civil action .. for such legal or equitable relief as will effectuate the purposes of this chapter,' would be to us a most unusual way of specifying review on an administrative record." This conclusion was buttressed by the similarities between the ADEA and Title VII, which outweighed the differences.

This case involves neither additional terminology concerning a hearing and trial as in *Chandler* nor similarities with another statute as in *Nabors*. However, any lingering doubt regarding Congress' intent is dispelled by its authorization of money damages for violations of the ISDEA. The APA does not authorize money damages, 5 U.S.C. § 702, although it does permit actions "to enforce [a] statutory mandate ... which happens to be one for the payment of money." *Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988).

A tribe generally will seek an order to force an agency to enter into and fund a self-determination contract. However, in some situations, an order to reverse, enjoin, or compel certain agency action may be insufficient.[5] For example, when an appropriation has lapsed or is not sufficient, the appropriate remedy will be money damages rather than injunctive relief. Potential damages also may include interest on a loan obtained by a tribe to fund a program pending the receipt of funding. Congress' specific authorization of money damages signals that tribes may hold the Secretary accountable for injuries caused by her violations of the ISDEA and are not merely limited to equitable relief under the APA.

Also, the jurisdiction of a district court is concurrent with the Court of Claims under the Contract Disputes Act, 41 U.S.C. §§ 601–613. The standard of review under that Act is one of a "proceed[ing] *de novo* in accordance with the rules of the appropriate court." 41 U.S.C. § 609(a)(3). Hence, review by a district court of such claims also must be *de novo* absent any statutory basis to distinguish between the two courts.

### 2. *Legislative History*

The ISDEA's legislative history confirms this interpretation. In 1975 Congress observed that "prolonged Federal domination of Indian service programs has served to retard rather than enhance the progress of Indian people," 25 U.S.C. § 450(a)(1), and mandated that control shift to the tribes. The Secretary originally was delegated broad general authority to "perform any and all acts and to make such rules and regulations as may be necessary and proper for the purposes of carrying out" the ISDEA. 25 U.S.C. § 450k(a) (1983). However, bureaucratic recalcitrance ultimately motivated Congress to enact massive amendments in 1988 and 1994 to restrict that authority.

Among the many problems noted were: (1) the "[i]nappropriate application of federal procurement laws ... result[ing] in excessive paperwork and unduly burdensome reporting requirements;" (2) the agency creation of an oppressive "contract monitoring bureaucracy;" (3) agency "imposition [of] additional reporting requirements on tribal contractors which often are not required under applicable law and regulations;" and (4) reallocation of funds due tribal contractors "to pay for such items as federal computer equipment acquisition and software development costs ... federal pay and retirement costs ... [and] federal contract monitoring costs." S Rep No 100–274, 100th Cong, 1st Sess at 7–8 (1987) *reprinted in* 1988 U.S.Code Cong & Admin News at 2619 ("1987 Senate Report"). As a result, Congress reduced the Secretary's general discretion by requiring that "all federal requirements for self-determination contracts and grants under this Act shall be promulgated as regulations in conformity with [the APA]." 25 U.S.C. § 450k (1994). It also created the additional remedy in federal district court, explaining:

> The strong remedies provided in these amendments are required because of those agencies' consistent failures over the past decade to administer self-determination

---

**5.** It is noteworthy that § 450m–1 does not specifically authorize the court to remand back to the Secretary.

contracts in conformity with the law. Self-determination contractors' rights under the Act have been systematically violated particularly in the area of funding indirect costs. Existing law affords such contractors no effective remedy to redressing such violations. Tribal contractors are denied access to injunctive relief to compel agency compliance with the law where the effect of any court order would be to require the Federal government to add funds to the plaintiff's contract. Furthermore, tribal contractors are unable to recover legal fees under the Equal Access to Justice Act even when they prevail on contract disputes in agency administrative proceedings.

1987 Senate Report at 37.

Six years later, frustrated with the Secretary's resistance to the 1988 amendments, Congress reinforced almost every section of the ISDEA, adopted a model self-determination contract (25 U.S.C. § 450*l*), and stripped the Secretary of all her delegated rulemaking authority except for 16 narrow areas. 25 U.S.C. § 450k(a)(1).

Congress had specific problems in mind which it addressed with appropriate remedies, namely injunctive relief and recovery of legal fees. However, Congress' apparent lack of discussion concerning the standard of review does not compel the conclusion that it rejected *de novo* review. Instead, no such discussion may have been necessary based on the expression of Congressional intent through other language in the ISDEA.

Under the ISDEA, a tribe has two alternate appeal routes when the Secretary declines a self-determination contract. The tribe may obtain "a hearing on the record with the right to engage in full discovery relevant to any issue raised in the matter *and* the opportunity to appeal on the objections raised." 25 U.S.C. § 450f(b)(3) (emphasis added). That appeal may either be within the agency or to an Administrative Law Judge ("ALJ"). 25 U.S.C. § 450f(e)(2). Any review of that decision is governed by the APA. Alternatively, a tribe may "in lieu of filing such appeal, exercise the option to initiate an action in a Federal district court."[6] 25 U.S.C. § 450f(b)(3).

There is no doubt that Congress intended to allow a tribe to save time by shortcutting the administrative appeal process. In 1994 Congress added to § 450m–1(a) the phrase permitting relief in court "to compel the Secretary to award and fund an approved self-determination contract" in order "to clarify the right of contractors to seek immediate judicial relief to review a declination finding or to secure the award and funding of an approved contract, *without first invoking further administrative levels of appeal or similar 'exhaustion' procedures which could further delay the contracting › process.*" S Rep No 103–374, 103rd Cong, 2d Sess. 14 (1994) ("1994 Senate Report"), p. 13 (emphasis added). This language reveals Congress' intent to permit the tribes to forego the administrative exhaustion requirement and quickly seek relief in a federal district court. However, speedy justice does not necessarily preclude the opportunity to obtain full discovery and a factual hearing, if appropriate.

■ In construing a statute, courts must "look to the provisions of the whole law, and its object and policy." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 455, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402 (1993). The ISDEA's object and policy are best achieved, and any agency mischief best redressed, by affording tribes the right to *de novo* review of their claims. The Secretary does not merely act as an impartial regulator, but has an obvious conflict of interest when enforcing the ISDEA's mandate to transfer federal programs and funds to tribes on demand. It is difficult to imagine an issue on which an agency would have a greater self-interest

---

**6.** The parties assume that filing an action in federal district court necessarily forecloses an administrative hearing. That assumption may be unwarranted. The statute allows an appeal to be filed in a federal district court only "in lieu of filing such appeal." It is not clear whether the reference to "appeal" means both a hearing and the appeal or only the appeal. If it refers only to the appeal, then a tribe conceivably first could obtain an administrative hearing with full discovery and then file its appeal in district court. However, that possible scenario is not presented in this case. Here, the Shoshone–Bannock Tribes opted not to have an administrative hearing, but to file immediately in federal district court. By doing so, the issue is whether they waived their right to discovery and a hearing in a federal district court.

than when determining whether, and how much, of its own authority and funding must be surrendered to a third party.

Given this history of Congressional concern with agency malfeasance, it would be ironic indeed if Congress offered the tribes nothing more than a record-based, deferential court review of agencies' actions which they already enjoyed under the APA for administrative appeals. To deny a tribe the same rights with respect to a claim filed in a federal district court than it is entitled to obtain through the administrative process would be a perverse result. A tribe should be entitled to the same full discovery, hearing and de novo review when it elects to proceed directly to court as it is entitled to receive if it elects to proceed before the agency or an ALJ.

### 3. *Presumption Favoring Indian Rights*

■ In addition to these reasons for rejecting the APA standard of review to the ISDEA, statutes affecting Indian rights, such as the ISDEA, should be liberally construed, and "doubtful expressions [should be] resolved in favor of the Indians." *State of Alaska ex rel. Yukon Flats School Dist. v. Native Village of Venetie Tribal Gov't,* 101 F.3d 1286, 1294 (9th Cir.1996), *cert granted* —— U.S. ——, 117 S.Ct. 2478, 138 L.Ed.2d 2987 (1997), citing *Alaska Pacific Fisheries Co. v. United States,* 248 U.S. 78, 89, 39 S.Ct. 40, 41, 63 L.Ed. 138 (1918). In giving Indian tribes access to federal courts to determine their rights and obligations under the Indian Child Welfare Act, the Ninth Circuit earlier explained in this same case:

> Because of the unique legal status of Indians in American jurisprudence, legal doctrines often must be viewed from a different perspective from that which would obtain in other areas of the law. *See, e.g., White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980) (The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law). Moreover, "standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians,*

471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985), Rather, "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Oneida County v. Oneida Indian Nation,* 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985). Statutes are to be construed liberally in favor of the Indians; ambiguous provisions are to be interpreted to the Indians' benefit. *Blackfeet Tribe,* 471 U.S. at 766, 105 S.Ct. at 2403.

*Native Village of Venetie I.R.A. Council v. State of Alaska,* 944 F.2d 548, 553 (9th Cir. 1991).

Similarly, the Tenth Circuit recently concluded that "the canon of construction favoring Native Americans controls over the more general rule of deference to agency interpretations of ambiguous statutes." *Ramah Navajo Chapter v. Lujan,* 112 F.3d 1455 at 1462 (10th Cir.1997).

Contrary to *California Health Board,* this court does not perceive the standard of review as merely a procedural issue to which this presumption favoring Native Americans is inapplicable. The standard of review is critical because it not only affects a tribe's ability to obtain discovery, but also affects the amount of deference to be accorded the agency's decision. Neither the Supreme Court nor the Ninth Circuit has given any indication that the presumption applies in some situations, but not others. In fact, the presumption has been applied in at least two cases involving procedural rights. *People of the Village of Gambell v. Clark,* 746 F.2d 572 (9th Cir.1984), *rev'd on other grounds sub nom Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987) (extending the geographic reach of certain procedural protections afforded to subsistence users challenging proposed oil development under Title VIII of the Alaska National Interest Lands Conservation Act); *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) (construing the Indian Civil Rights Act to provide only limited federal judicial review of tribal actions). The rationale behind the presumption should apply equally to all issues of statutory construction, wherever they may arise in uniquely Indian legislation.

■ As a practical matter, any court would prefer not to review *de novo* funding decisions "which would entangle the court in assessing and balancing policies, programs, and principles of federal appropriations, the details of which no court is equipped to handle." *YKHC* at 11. However, this court cannot ignore its obligation to decide disputes brought before it, regardless of the factual intricacies or technical issues involved. It is the responsibility of the parties to properly educate the court, not of the court to improperly defer to an agency decision.

Because a tribe claiming that the Secretary has violated its rights under the ISDEA is better protected by a civil trial *de novo* before an impartial court, than by deferential judicial review of an agency-created record, any ambiguity in § 450m–1(a) should be resolved in favor of the right to *de novo* review.

### B. *Defendants' Request to Limit the Record*

Arguing for application of the APA, defendants request this court not to consider the depositions, answers to interrogatories, and admissions which they have provided through discovery in this case, but to instead limit review to the "administrative record" consisting solely of documents produced by them. Based on this court's decision that the APA does not govern the standard of review, defendants' request is denied.

### C. *Burden of Proof*

Unlike the usual civil case in which the plaintiff bears the burden of proof by a preponderance of the evidence, the ISDEA places the burden of proof in any hearing or on appeal on the Secretary "to establish by clearly demonstrating the validity of the grounds for declining the contract proposal (or portion thereof.)" 25 U.S.C. § 450f(e).

### V. *WITHHOLDING OF TITLE I RETAINED AMOUNT (Fourth Claim)*

The Fourth Claim alleges that defendants violated 25 U.S.C. § 450j–1(a) and (b) by improperly deducting a "Title I Retained Amount" from the amount of Portland Area Office funds available for self-determination contracting.

Defendants respond that the "Title I Retained Amount" reflects funding associated with programs and functions that the Secretary must continue to perform and which are not subject to self-determination contracts by the tribes. In order to determine what funds are available for contracting by the tribes, defendants must calculate the Secretarial Amount which is the "amount of funds ... the ... Secretary would have otherwise provided for the operation of the programs ... covered by the contract ... including supportive administrative functions that are otherwise contractable." 25 U.S.C. § 450j–1(a)(1). According to the defendants, the Title I Retained Amount is not "otherwise contractable," and therefore is properly deducted from the Secretarial Amount.

In determining the Secretarial Amount for contracting by the Shoshone–Bannock Tribes, defendants subtracted five items from the Portland Area Office Budget of approximately $15.6 million for FY 1996, namely:

(1) "Earmarked Funds" [7] of $376,554;

(2) "Residual Amount" [8] of $2,134,000;

(3) "Self–Governance Amount" [9] of $1,320,209;

(4) "Title I Retained Amount" of $1,320,209 (which is in dispute); and

(5) "Service Unit Transitional Amount" [10] of $1,603,001.

Plaintiff's Exhibit 4, p. 5.

As a result of these deductions, less than half, or $6.67 million, was available to all

---

**7.** These are apparently funds dedicated by Congress to particular purposes and not available for distribution. Plaintiff's Exhibit, p. 20.

**8.** These are fund needed to perform the inherently federal functions that would remain with the Secretary in the event all 41 Portland Area tribes eventually compact to run all available programs to the fullest extent allowed under Title III. Plaintiff's Exhibit 4, p. 20.

**9.** These constitute all funds payable to tribes currently under Title III compacts. Plaintiff's Exhibit 4, p. 20.

**10.** This is "the amount held at the Area Office to meet Area Office costs for continued Service Unit

Portland Area tribes contracting under Title I in FY 1996. At that time, 31 tribes in the Portland Area Office, including the Shoshone–Bannock Tribes, were "Title I" contracting tribes, and the other 10 tribes were "self-governance" or "compacting" tribes under Title III.

Four of these five deductions are not in dispute. However, the Shoshone–Bannock Tribes contend that deduction of the Title I Retained Amount violates 25 U.S.C. § 450j–1 (a) and (g) for two reasons: (1) the Title I Retained Amount consists of amounts defendants may not lawfully deduct from the Secretarial Amount; and (2) defendants failed to satisfy the ISDEA's declination requirements.

### A. *Deduction of the Title I Retained Amount from the Secretarial Amount*

■ The parties have a basic disagreement over the purpose of the Title I Retained Amount. The Portland Area Office budget contains various line items for hospitals and clinics, various programs (Dental, Mental Health, Alcoholism, Public Health Nursing, and Health Education), direct operations, contract health care services, and the Office of Environment, Health, and Engineers. The Shoshone–Bannock Tribes argue that once the Portland Area Office budgets a certain amount to a certain program, such as Maternal & Child Health, then that line item constitutes the Secretarial Amount for the operation of that program which cannot be reduced. They point out that the ISDEA specifically requires that the Secretarial Amount:

(1) shall not be reduced to make funding available for *contract monitoring or administration* by the Secretary;

\*　　\*　　\*　　\*　　\*　　\*

(3) shall not be reduced by the Secretary to pay for *Federal functions*, including, but not limited to, Federal pay costs, Federal employee retirement benefits, automated data processing, contract technical assistance or *contract monitoring;*

(4) shall not be reduced by the Secretary to pay for the costs of Federal personnel

Administration." Plaintiff's Exhibit 4, p. 20. This amount is not presently challenged in this

displaced by a self-determination contract; . . .

25 U.S.C. § 450j–1(b) (emphasis added).

Defendants respond that the Title I Retained Amount is not a prohibited reduction of the Secretarial Amount under, the ISDEA, but is an appropriate deduction to cover the cost of services which the tribes cannot assume. The Title I Retained Amount is described in the Portland Area Office budget worksheet as:

the amount required for continued direct administration of existing and future Title I contracts. The Title I retained amount also provides for the staffing that will be required to evaluate, negotiate, and award proposals for continued assumption of service unit programs and Area Office and Headquarters shares; and negotiate Annual Funding Agreements (AFA's) required [by] P.L. 103–413, the Amendments to P.L. 93–638.

Plaintiff's Exhibit 4, p. 20.

This description is confirmed by Thomas Tahsuda, the former Acting Director of the Portland Area Office's Division of Self–Determination Services, who testified that the Title I Retained Amount is the "amount required by the area office for the continued administration of Title I contracts." Plaintiff's Exhibit 5, p. 4. For example, it provides for the "review [of] proposals that were submitted for Maternal & Child Health program assumptions or for area office shares or for the redesign of program funds for the Maternal & Child Health program." Plaintiff's Exhibit 26, p. 2. This same principle applies to other programs. *Id.* The amount does not include program evaluation once a program has been taken over by a tribe. Plaintiff's Exhibit 5, p. 18. However, it does include the review, evaluation and negotiation of proposals by tribes, such as the annual funding agreement negotiations. *Id.* at 18, 21.

According to Mr. Tahsuda, the Title I Retained Amount was derived by withholding a flat 15% from the relevant line items on the Title I Amounts Available Spreadsheet.

case.

Plaintiff's Exhibit 5, pp. 5–6. It was "an estimate by the joint IHS tribal work group that 15 percent set aside in that column was a reasonable set aside." *Id.*

Defendants are adamant that the cost of evaluating contract proposals and negotiating annual funding agreements are not contractable, but are inherently federal functions which tribes cannot assume. Those duties which the ISDEA imposes on the Secretary which no tribe can perform include: entering into self-determination contracts, 25 U.S.C. § 450f(a)(1); reviewing and approving or declining contract proposals, 25 U.S.C. § 450f(a)(2); providing technical service in connection with development of new self-determination contracts, tribal assumption of programs, and modification of existing contracts, 25 U.S.C. § 450h(d); evaluating proposals to redesign programs, 25 U.S.C. § 450j(j); determining the amount of funds the "Secretary would have otherwise provided for the operation of" contracted programs, 25 U.S.C. § 450j–1(a)(1); and negotiating annual funding amounts, 25 U.S.C. § 450j–1(a)(3)(B).

Because the Division of Acquisitions, Office of Support Services, is responsible for some of these functions, none of its budget is made available for tribes under Title 1. Plaintiff's Exhibit 4, p. 5, 1. 65. However, as explained at oral argument, not all of these functions are performed solely by that office. That office may require the assistance of employees who are covered by other line items in the budget. For example, a social worker in the Maternal and Child Health Care Program may be required, among other functions, to participate in the evaluation of a new contract proposal by a tribe to take over that program. When providing that function, the social worker is performing a function that only IHS can perform. As long as the Portland Area Office retains employees to support certain programs which have not yet been fully assumed by all of the Portland area tribes, those employees may need to spend part of their time reviewing contract proposals. Once all tribes assume a particular program, then, of course, that need ceases. Until then, this continuing responsibility is a cost that IHS must cover by retaining some funds.

Based on the undisputed facts, this court is persuaded that the concept of the Title I Retained Amount is not inherently an improper reduction from the Portland Area Office budget for contract monitoring or administration. Instead, it is intended to cover costs which are not for the operation of any program and therefore which should not be included in the Secretarial Amount.

Confusion arises because of the way in which the Portland Area Office deducted the Title I Retained Amount. Instead of subtracting a lump sum from the entire budget to cover Title I non-contractable costs, the Portland Area Office first divided its budget into line items and then subtracted 15% from certain line items to cover these costs. This method gives the misleading appearance that the Portland Area Office first determined the cost of operating a program (or the Secretarial Amount), and then improperly reduced that amount. However, appearance does not comport with reality. Each line item in the budget does not in fact represent the Secretarial Amount for that line item.

Although this court concludes as a matter of law based on undisputed facts that the Title I Retained Amount in theory is a proper deduction from the Portland Area Office budget, it is not at all clear that the amount deducted is proper. Although characterized by defendants as an issue of contractability, this issue is more appropriately characterized as essentially one of funding. The Shoshone–Bannock Tribes did not propose to operate any noncontractable, inherently federal functions which they cannot assume. Instead, the issue is whether the funds requested by the Shoshone–Bannock Tribes for each targeted line item of the Area Office budget exceed the amount the Secretary would have otherwise spent for the tribes for that activity. Thus, even if some amount should be retained by the Portland Area Office for Title I contracting activities, this court must determine whether the Secretary has met her burden with respect to the amount retained. That issue is addressed next.

**B.** *The Secretary's Finding Regarding the Title I Retained Amount*

The ISDEA directs the Secretary to approve and award proposed contracts "unless

the Secretary provides written notification to the applicant that contains a specific finding that clearly demonstrates that, or is supported by a controlling legal authority that," one of five specific "declination criteria" applies. 25 U.S.C. § 450f(a)(2). The Secretary declined the proposal concerning the Title I Retained Amount based on criterion D: "the amount of funds proposed under the contract is in excess of the applicable funding level for the contract." 25 U.S.C. § 450f(a)(2)(D). To prevail, the Secretary must "establish by clearly demonstrating the validity" of that reason for declining the Tribal Shares Contract Proposal. 25 U.S.C. § 450f(e)(1). The Secretary's Partial Declination Letter explained as follows:

> In determining the amounts available for contracting under 106(a)(1) the Tribes take the amount budgeted for a particular line, subtracts [sic] the Title III residual and the amount awarded to Title III compact tribes from that amount and multiplies that amount by [the Shoshone–Bannock Tribes' share of the Portland Area User Population] to arrive at their Tribal share. *In our opinion, this methodology overstates the Tribes' 106(a)(1) amount. Pursuant to section 102(a)(2)(D) we decline to contract in the amount proposed by the Tribes.*
>
> The 106(a)(1) amount should be computed in the following manner. The amount budgeted for PAIHS for a particular line item should be reduced by: the Title III residual, the amount awarded to Title III tribes in compacts, *the amount retained to provide services to Tribes who contract under Title I of the [ISDEA],* and by the amount retained to avoid adverse impact to non-contracting Tribes. The remainder is the amount available for contracting under Title 1.

Plaintiff's Exhibit 3, p. 2 (emphasis added).

The Shoshone–Bannock Tribes contend that this statement does not meet the Secretary's obligation to contain a "specific finding" explaining how the cited declination criterion D applies, and does not contain any controlling legal authority supporting the conclusion that the amount proposed by the Shoshone–Bannock Tribes in fact exceeds the applicable funding level.

Contrary to the Shoshone–Bannock Tribes' contention, the Partial Declination Letter provides a sufficient explanation of the legal basis for the Secretary's decision. However, the evidence in the record is inadequate to clearly demonstrate that the amount proposed by the Shoshone–Bannock Tribes for the Secretarial Amount in fact exceeds the applicable funding level.

The record reveals only that for FY 1996, an unidentified IHS joint tribal work group estimated that 15% of the budgeted cost for certain programs should be retained for Title I noncontractable costs. But the amount required for evaluation of new contract proposals obviously will vary from year to year depending on the number of new contract proposals submitted. Defendants have not provided this court with any information as to how many Title I contracts were estimated for FY 1996, how the joint tribal group reached the 15% figure, why it is reasonable, and how it compares to prior or subsequent years.

In fact, the methodology for calculating the Title I Retained Amount changed dramatically for FY 1997. The worksheet for that year contains a new column labeled "106(a)(1)" which represents the Secretarial Amount calculated as the budget less "earmarked funds," "residual amount," and "self-governance amount." Defendants' Exhibit E, "Title I Tribal Shares Allocation Methodology for Area Office Shares FY 1997," p. 4. From the Secretarial Amount, the "Title I Retained Amount" is deducted. However, the "Title I Retained Amount" is no longer a flat 15% figure, as in FY 1996, but is a different round number for each line item, *e.g.* $5,000 for Maternal & Child Health, which is much less than 15%. Defendants have provided no explanation for this difference.

In addition, when all tribes move from Title I contracts into self-governance (Title III) compacts, the Portland Area Office will no longer need any Title I Retained Amount. In fact, the Portland Area Office anticipated some change in the amounts withheld by stating that the Title I Amount available to the tribes "will be increased periodically as downsizing occurs." Plaintiff's Exhibit 4, p. 20. Eventually it will need only to retain the

"Residual Amount" which is the "amount of resources required to maintain the minimum federal activity required by statute if all Tribes compact under Self–Governance all IHS programs, activities, functions, and services." Plaintiff's Exhibit 4, p. 20. In other words, at the same time as the number of Title I contracts decrease, Title III compacts will increase. Therefore, one would expect the Title I Retained Amount and Title III "Residual Amount" to bear an inverse proportion to one another. However, the "Residual Amount" is the same for both FY 1996 and FY 1997 ($2,134,000), while the Title I Retained Amount decreased slightly from $1,320,209 for FY 1996 to $1,182,386 for FY 1997.

The explanation for this apparent inconsistency lies in the definition of "Residual Amount." Although only 10 of the 41 Portland Area tribes had entered into compacts, the Portland Area Office deducted not just the "Residual Amount" for those 10 tribes, but the "Residual Amount" for the other 31 non-compacting tribes as well. This results in a duplicative deduction since a tribe will not fall into both categories at the same time. If a tribe is entering into a Title I contract, it will not also be negotiating a Title III compact and *vice versa.* Yet in FY 1996, a Title I contracting tribe suffered a 15% reduction in available Title I funds to cover the cost of negotiating the Title I contract, as well as a reduction for the "Residual Amount" as if it were already a compacting tribe.

Defendants have not offered any justification for this apparent "double-dipping" other than substantially greater oversight and review responsibilities under Title I than under Title III. Unlike Title I, the Secretary has no discretion under Title III to decline to enter into a compact, but is restricted to negotiating terms. Thus, the Secretary's Title I responsibilities require a larger staff to review the substance of proposals than do her Title III responsibilities. However, the requirement of additional staff under Title I fails to justify a deduction under both Title I and Title III for a Title I contracting tribe. Instead, the deduction should move from one category to the other as a tribe moves from one category to the other.

In other words, although defendants are entitled to deduct some amount to pay for the cost of Title I non-contractable activities, the record is inadequate for this court to conclude on summary judgment that the 15% figure is an appropriate amount for that deduction. The ISDEA requires the Secretary to satisfy her burden of proof to clearly demonstrate the basis for her declination decision. That burden is not satisfied by the Secretary unilaterally removing from consideration whatever sum the Secretary chooses, with the remainder then defined as the Secretarial Amount. Such an approach serves to eliminate any scrutiny by the agency or the court of how the Secretarial Amount was calculated in the first place and whether the remaining amount reflects the amount the Secretary had been spending for the operation of a particular program for the tribes. Congress clearly foreclosed this strategy to avoid judicial review by crafting specific declination criteria.

Instead, the Secretary is obligated to present evidence of the amount it has historically spent to operate certain programs or, conversely, spent to provide non-contractable Title I functions. For example, if a tribe submits a proposal seeking $1.2 million to take over operation of a clinic, but the Secretary determines that IHS spends only $1 million per year to operate this clinic, then the Secretary may issue a partial declination letter agreeing to a contract of only $1 million. Conversely, the Secretary may determine that 15% of its $1.2 million budget for the clinic accurately represents non-contractable costs and may issue a partial declination letter agreeing to a contract of only $1.02 million. However, in both cases, when challenged by the tribe, the Secretary bears the burden to clearly demonstrate that its determination is accurate concerning either the cost to operate the clinic or the amount of non-contractable costs.

 Due to the lack of evidence to clearly demonstrate that the 15% retainage was necessary to fund the Title I non-contractable functions, as opposed to one-tenth or even ten times as much, the Secretary is not entitled to summary judgment sustaining her declination based on the Title I Retained Funds. The question remains whether this failure of proof in turn entitles the Sho-

shone–Bannock Tribes to summary judgment. Heightened evidentiary requirements, such as clear and convincing evidence, must be taken into account when ruling on a motion for summary judgment, just as when ruling on a motion for directed verdict. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). "Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* Consequently, the proper inquiry is whether the evidence presented is such that a fact-finder could reasonably find either that the defendants have clearly demonstrated that the Title I Retained Amount is proper or that they have not.

Although a genuine issue of material fact exists as to whether or not the 15% retainage is reasonable, this court is far from certain that the quality and quantity of evidence submitted is sufficient for defendants to meet their burden of proof at a hearing. However, at the time they filed their summary judgment motions, the parties did not know whether this court would apply the *de novo* standard of review and that uncertainty may well have affected the type of evidence submitted. Trial courts should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." *Id.* 477 U.S. at 255, 106 S.Ct. at 2513 citing *Kennedy v. Silas Mason Co.,* 334 U.S. 249, 68 S.Ct. 1031, 92 L.Ed. 1347 (1948). Exercising that caution, this court would prefer to deny summary judgment to both parties on the Fourth Claim and hold a hearing to permit the record to be more fully developed as to the proper amount of the Title I Retained Amount.

## VI. *DENIAL OF 80% OF PORTLAND AREA OFFICE SHARE (Sixth & Seventh Claims)*

The Sixth and Seventh Claims both concern the Portland Area Office administrative share. The Sixth Claim alleges that defendants violated 25 U.S.C. § 450j–1(a) and (g) by failing to award 100% funding for all Area administrative functions proposed by the Shoshone–Bannock Tribes. The Seventh Claim alleges that defendants violated 25 U.S.C. § 450k by unlawfully imposing on the Shoshone–Bannock Tribes the Portland Area Office "Release Plan."

According to the "Release Plan," the Secretary determined that it would release only approximately 20% of its Area administrative shares for FY 1996 Title I contracting on January 1, 1996, another 58% on October 1, 1996, and the remainder in FY 1997 and 1998. This is described in the Partial Declination Letter as follows:

> The Tribe has requested that all negotiated Area Shares be released upon award of the contract. We decline to do so. Again the lengthy tribal consultation process that began in March of 1995 has resulted in the development of a Portland Area "release plan". The schedule of release of available Area Office shares is January 1, 1996,— 20%; October 1, 1996—58%, and the remaining in FY 1997 and FY 1998. The Portland Area cannot release all funds to the Shoshone–Bannock Tribe or any other Tribe applying for its Area shares in FY 1996.

Plaintiff's Exhibit 3, pp. 3–4.

This schedule was based on the Portland Area Office's determination that if all tribes requested administrative shares in 1996, it could reduce its staff by 30 full-time employees at a salary savings of $1,494,000. Plaintiff's Exhibit 27, pp. 4–5. However, of that amount, $1,125,000 would be used to fund "employee separation" costs, leaving a total amount of $369,000—or approximately 20%— available for distribution by July 1, 1996.

IHS subsequently adopted a uniform "Tribal Shares Transfer Schedule Policy" in December 1996. Defendants' Exhibit F. According to that policy, 100% of an applicant's share in liquid form is payable immediately, with payment of 50% of the encumbered assets deferred for up to 12 months and the remaining 50% deferred for up to 24 months.

To the extent that the Shoshone–Bannock Tribes allege in the Sixth Claim that the Secretary awarded only 20% of the Portland Area Office share, they are mistaken. They were awarded 100%, but payment was deferred pursuant to the "Release Plan."

Although the Shoshone–Bannock Tribes express concern that the Secretary has permanently refused to pay 80% of the FY 1996 and FY 1997 Area shares to which they are entitled, that fear is unfounded. The Secretary has paid 78% of the FY 1996 Area shares to the Shoshone–Bannock Tribes and has not denied its obligation to pay the remaining 22% before the end of FY 1998 (September 30, 1998) as required by the "Release Plan." Instead, the issue is whether or not the Secretary should complete payment sooner rather than later.

Also with respect to both the Sixth and Seventh Claims, the Shoshone–Bannock Tribes argue that the "Release Plan" is illegal because (1) the ISDEA prohibits deferred payments, and (2) the Secretary has improperly withheld payment. As discussed below, this court concludes that deferred payments are permitted, but that payments may not be deferred for an unreasonable length of time.

### A. Deferral of Payments

■ The Shoshone–Bannock Tribes contend that nothing in the ISDEA permits the Secretary to retain any portion of the Secretarial Amount and release funds incrementally. However, no provision of the ISDEA requires full payment immediately upon award of a Title I contract.

The ISDEA requires that upon approval of a Title I contract, "the Secretary shall add to the contract the full amount of funds to which the contractor is entitled." 25 U.S.C. § 450j–1(g). In addition, the ISDEA requires the Secretary to approve any severable portion of a contract proposal. 25 U.S.C. § 450f(a)(4). Although these provisions mandate full funding upon approval of a contract or any severable portion, they do not mandate that the Secretary pay the contract amount in full at any particular point in time.

To the contrary, two other provisions of the ISDEA provide the Secretary with discretion as to the timing of payments under self-determination contracts. According to 25 U.S.C. § 450j(b), "[p]ayments ... under any [self-determination] contracts ... may be made ... in such installments and on such conditions as the appropriate Secretary deems necessary to carry out the purposes of this part." This provision clearly permits the Secretary to release funds incrementally. In addition, a provision of the mandatory model agreement included in the text of the ISDEA permits quarterly, semiannual, lump-sum and other methods of payment for each fiscal year. 25 U.S.C. § 450l(a) and (c).

In enacting 25 U.S.C. § 450j(b), Congress was concerned not with authorizing delays in payments, but with providing explicit authority for speedier advance payments:

> Section 106(b) authorizes payments with regard to any grants or contracts under sections 102, 103, and 104 to be "made in advance or by way of reimbursement and in such installments and on such conditions" as deemed necessary. Such advance payment authority is essential because many tribes do not have sufficient funds of their own to operate contracted programs or activities on a reimbursable basis. However, we shall administer this authority so as to minimize the time elapsing between the date of each payment to a tribal organization and the necessary disbursement of such payment by the organization.

HR Rep No 93–1600, 93rd Cong 2d Sess, *reprinted in* 1974 USCode CongAdminNews 7775, 7790.

However, the ISDEA also requires the Secretary to ensure that programs are divided in a manner that continues to provide services to non-contracting tribes:

> If a self-determination contract requires the Secretary to divide the administration of a program that has previously been administered for the benefit of a greater number of tribes than are represented by the tribal organization that is a party to the contract, the Secretary *shall take such action as may be necessary to ensure that services are provided to the tribes not served by a self-determination contract,* including program redesign in consultation with the tribal organization and all affected tribes.

25 U.S.C. § 450j(i)(1) (emphasis added).

As explained by defendants, the "Release Plan" was developed to harmonize the Secretary's seemingly conflicting goals and responsibilities under the ISDEA to transfer

funding to contracting tribes as quickly as practicable and, at the same time, to maintain health care services to non-contracting tribes. The tension between these goals arises because tribes contract for services, not for liquid assets. Funding for the majority of IHS programs is tied up in, or encumbered by, fixed, non-liquid assets, such as permanent employees and binding contracts for payment of goods and services. Defendant's Exhibits F and G. Often, an individual employee will service more than one tribe. That employee's salary and benefits cannot be immediately liquidated and paid out to contracting tribes without interrupting services to the non-contracting tribes. When a tribe contracts for its Area Office administrative share, the funds associated with that share come from a variety of encumbered sources which must be liquidated before funds can be paid out. In particular, with respect to personnel costs, the Secretary must comply with a variety of federal employment laws.[11]

The Secretary claims that it is simply not feasible to liquidate assets in 90 days between receipt of contract proposal and award of the contract, and that more time is required. Accordingly, the "Release Plan" was designed to provide for the liquidation of encumbered resources necessary to provide funds to pay administrative support costs to contacting tribes without violating applicable employment laws, while simultaneously minimizing the disruption of services to non-contracting tribes. The purpose of the "Release Plan" is to inform a tribe how long it will take to liquidate the necessary assets and pay over the tribe's shares. The Shoshone–Bannock Tribes have not presented any evidence to dispute the Secretary's need to liquidate assets in order to create a source of funds to pay the tribal share.

Thus, the undisputed facts lead to the conclusion that the Secretary may delay payment until the necessary liquidation can be completed. Pending liquidation and payment, the tribes are not required to operate a program without sufficient funding. During that transition period, the Area Office continues to provide administrative services.

As a result, certain tribes such as the Shoshone–Bannock received funds as they became available in FY 1996 and continued to receive services for the balance of statutory entitlement during that year. Nevertheless, the Secretary cannot delay payment for an unreasonable length of time in order to frustrate the purposes of the Title I contract. How soon liquidation must be completed and full payment made is addressed in the next section.

The Shoshone–Bannock Tribes also contend that the Secretary has not identified any of the five "declination criteria" as supporting her decision not to immediately award the full amount of Area Office administrative shares. However, the Secretary did not decline to fund the contract proposal, but instead declined only to release 100% of the Area Office shares upon award of the contract, in favor of a scheduled release over time. This decision affects only the timing of the payment, not the amount of the payment. Thus, the Secretary need not have identified any "declination criteria" to support deferred payment pursuant to the "Release Plan."

■ In their Seventh Claim, the Shoshone–Bannock Tribes allege that the "Release Plan" violates 25 U.S.C. § 450k(a)(1) which provides that the "Secretary ... may not promulgate any regulation, nor impose any nonregulatory requirement, relating to self-determination contracts or the approval, award, or declination of such contracts," except in 16 specific areas. This argument fails because the "Release Plan" is not a "regulation" or a "nonregulatory requirement." It does not require the tribes to do anything not specified by the ISDEA. Instead, it is merely a "general statement of policy" designed to inform the public how the Secretary intends to exercise her discretion under the ISDEA with respect to timing the payment of funds to contracting tribes. In that sense, it is not at all comparable to the illegal requirement in *Ramah Navajo School Bd.*, 87 F.3d at 1350. The plaintiff in *Ramah* challenged a Bureau of Indian Affairs' policy directing tribes to submit their requests for

---

**11.** These include 5 U.S.C. § 5595 and 5 C.F.R. §§ 550.701–550.713 (governing severance pay), 5 C.F.R. § 351.301 (regarding transfer of func-

tion), and 5 U.S.C. §§ 1302, 3502, and 3503 and 5 C.F.R. § 351 (regarding reductions in force).

contract support costs by a certain date. Those who missed the deadline were only eligible for 50% of their requested funding. The court held that this policy "smacks of punishment" for tardiness and violated the ISDEA requirement of a *pro rata* reduction of payments to all tribes in order to effectuate the statutory scheme and congressional intent. *Id* at 1348–49. In contrast, the "Release Plan" does not violate any provision of the ISDEA by denying full funding to the Shoshone–Bannock Tribes, but instead provides for payment of that funding in installments over a period of time. Thus, defendants are entitled to summary judgment on the Seventh Claim.

### B. *Improper Withholding of Payment*

 Even if the Secretary theoretically may defer the release of funds in order to permit the liquidation of encumbered assets, the Shoshone–Bannock Tribes contend that the Secretary had sufficient unencumbered assets to fully award and fund its proposal in FY 1996 without adversely affecting any other tribe or program.

However, this argument is premised on a misunderstanding. When the 1994 amendments to the ISDEA were adopted, IHS was faced with the possibility that every tribe currently contracting under Title I would request their shares. In anticipation of this "worst case" scenario, the Portland Area Office compiled the "Release Plan" premised on termination of 30 employees which would generate $369,000 by July 1, 1996. However, the worst case did not occur because not all tribes requested Area shares in FY 1996. Only six of the 31 contracting Portland Area tribes requested any tribal shares in FY 1996, and only the Shoshone–Bannock Tribes requested those funds for the entire fiscal year. Accordingly, the Portland Area Office could not downsize as aggressively as anticipated, did not eliminate 30 employees and did not generate $369,000. Therefore, it had less funds available as of July 1, 1996, than anticipated under the "Release Plan."

 When dividing the administration of a program between tribes, the Secretary is required to "take such action as may be necessary to ensure that services are provided to the [noncontracting] tribes, including program redesign." 25 U.S.C. § 450j(i). However, program redesign by liquidating assets is not the only option available under the ISDEA. The ISDEA does not force the Secretary to prefer contracting tribes over non-contracting tribes by firing employees who service other tribes in order to free funds to pay to contracting tribes. Instead, the ISDEA specifically recognizes the potential shortage of funds by providing that:

> Notwithstanding any other provision in this Act, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter.

25 USC § 450j–1(b).

In order to continue to provide services to non-contracting tribes for FY 1996, the Portland Area Office needed to retain certain employees for a period of time. Therefore, it contracted with the Shoshone–Bannock Tribes to perform 20% of the services commensurate with 20% of the unencumbered funds it was able to provide at that time and retained responsibility for providing services equal to the 80% balance to which the Tribes were entitled. As a result, in FY 1996, the Shoshone–Bannock Tribes received their full entitlement of health care either through the payment of funds or the provision of services. As liquidation and program redesign continued, defendants intended that the Shoshone–Bannock Tribes would receive full payment in funds in lieu of services. The issue is whether the Secretary can defer full funding beyond the end of FY 1996.

As discussed above, the liquidation process necessarily takes time. However, IHS lacked a uniform transfer policy concerning the appropriate length of that liquidation process until adopting one in December 1996 pursuant to the recommendation of the IHS Business Plan Work Group.[12] The policy

12. That group presumably was established pursuant to 25 U.S.C. § 450a–1 which authorizes advisory committees "composed of members of Indian tribes or members of Indian tribes and representatives of the Federal Government to ensure tribal participation" in the ISDEA.

was intended to resolve the tension between immediate funding and providing services to non-contracting tribes:

> Tribes are uncertain about when to expect transferred resources and when to assume responsibility for the PFSA. This uncertainty has led to assertions that the IHS is not acting expeditiously to free up encumbered resources for transfer.

Defendants' Exhibit F, p. 2.

Pursuant to that uniform transfer policy, 100% of the tribal shares must be transferred no later than 24 months after the contract start date. This schedule purportedly provides a "reasonable, but limited period of time," for Headquarters Area Offices "to redesign programs/activities and implement a RIF and/or deployment effort to free encumbered resources for transfer as tribal shares." *Id. Ipso facto,* any longer schedule for release of funds must be unreasonable.

Although it would be far preferable to require payment of the Secretarial Amount to a contracting tribe immediately upon approval of the contract, the ISDEA does not require the impossible. Nor does the ISDEA allow deferral of payment forever. Instead, the ISDEA permits the Secretary to retain funding for programs serving non-contracting tribes and requires the Secretary to "take such action as may be necessary to ensure" that such services are provided, which may necessitate a delay in payment to non-contracting tribes until encumbered resources are liquidated. The 24 month delay permitted by the IHS uniform transfer policy extends payment beyond the end of the fiscal year for which a contract is awarded. However, based on the record submitted, this court cannot determine if a 24 month delay in payment recommended by IHS Business Plan Work Group is a reasonable time frame.

Also, it is not clear whether the IHS uniform transfer policy applies to the Shoshone–Bannock Tribal Shares Contract Proposal.[13] If it does apply, then the Shoshone–Bannock Tribes should receive 100% funding no later than 24 months after the contract start date. Since the start date for the Tribes Contract Shares Proposal was October 1, 1995, for FY 1996, full payment should have been made by September 30, 1997. This date is 12 months earlier than permitted under the Portland Area Office "Release Plan," which means that the Shoshone–Bannock Tribes are overdue for release of the final 22% of their FY 1996 Area Office administrative share. However, if the IHS uniform transfer policy does not apply, then the obvious question is why the Portland Area Office requires a period of time longer than 24 months to liquidate its encumbered resources.

The record is devoid of any evidence concerning the reasonableness of the payment schedule set forth in the "Release Plan" other than the IHS uniform transfer policy containing a shorter release schedule. This lack of evidence precludes summary judgment in favor of defendants on the Sixth Claim. With respect to the Shoshone–Bannock Tribes' cross motion for summary judgment, a genuine issue of material fact exists as to the reasonableness of the "Release Plan." Once again, this court is uncertain whether the Secretary can meet her burden of proof clearly demonstrating that the "Release Plan" is reasonable. However, exercising an abundance of caution, this court prefers to make a finding concerning reasonableness in the context of a fully developed record at a hearing. Therefore, the better course at this juncture is to deny both summary judgment motions on this issue.

As a result of this ruling, this court need not address at this time whether defendants paid out all unencumbered funds for FY 1996, or whether IHS has various appropriation accounts lying around, unused and unneeded, to make payments. In any event, the record as to those issues also is inadequate and presents disputed fact issues.

## VII. *FAILING TO FUND CERTAIN HEADQUARTERS FUNCTIONS (Eighth Claim)*

The Eighth Claim alleges that defendants violated 25 U.S.C. § 450f(a)(1) and

---

13. The policy applies to "new Title I and Title III applications for Headquarters and Area Office shares beginning in FY 1996 and in years thereafter." Exhibit F, p. 3. The reference to "new" may include only those applications submitted after adoption of the policy or may include all applications for FY 1996. However, this court need not decide that issue for purposes of these motions.

(2) and § 450j–1(a) and (g) by failing to award and fully fund the approved Headquarters Office administrative functions proposed in the Tribal Shares Contract Proposal.

The Secretary gave the following reason for refusing to fund these particular line items:

> None of the [amount specified in this line item] is currently available for funding as an award of these funds would adversely affect other tribes and would therefore be in violation of Section 105(*l*) [25 U.S.C. § 450j(i) ] ... and the third declination criterion in Section 102(a)(2)(C) [25 U.S.C. § 450f(a)(2)(C) ]. These amounts will not be made available in FY 1996 as they are tied up in fixed costs, and other long term commitments of funds.

Plaintiff's Exhibit 3, pp. 5–6.

The Shoshone–Bannock Tribes contend that failure to fund the Headquarters shares violates the ISDEA in two respects: (1) the Partial Declination Letter failed to provide specific factual "findings" "clearly demonstrating" the denial, and (2) the cited declination criterion does not even apply. Defendants defend the declination with the same arguments advanced to support the Portland Area Office "Release Program," namely that the issue is simply one of timing.

Contrary to defendants' position, this issue is not simply one of timing. Unlike the decision to defer release of the Area Office administrative shares over a period of several years, the Secretary declined to contract and to award anything in FY 1996 for 17 Headquarters programs. Declining to award any portion of the various proposed programs and associated funds for FY 1996 is not the same as simply delaying payments under an approved contract.

 Nothing in the ISDEA supports the declination of a contract proposal by simply stating that no funds are available and/or that paying the requested funds would harm other tribes. The difficulty of dividing the administration of a program to comply with a self-determination contract is not one of the five declination criteria. Instead the ISDEA explicitly requires the Secretary to approve and fund proposed contracts at the "level of funding authorized under section 450j–1 (a)."

25 U.S.C. § 450f(a)(4). Only then does § 450j(i) permit the Secretary to take such action as may be necessary to mitigate adverse consequences to other tribes, "including program redesign in consultation with the tribal organization and all affected tribes." That section simply provides no authority for using the possibility of adverse consequences as a justification to entirely decline a contract proposal.

 Furthermore, the Partial Declination Letter refers only to the third declination criterion C which provides that "the proposed project or function to be contracted for cannot be properly completed or maintained by the proposed contract." 25 USC § 450f(a)(2)(C). This criterion would apply, for instance, where a tribe proposes to build an IHS clinic under a proposal for doing so that is not feasible. The Secretary has provided absolutely no evidence supporting a finding—much less clearly demonstrated—that this criterion is even relevant, let alone applicable. The only reason given in the Partial Declination Letter is a conclusory statement that the award of funds would hurt other tribes and are tied up in fixed costs. This is not a sufficient basis for declining to award a contract proposal under criterion C.

This court notes that the IHS uniform transfer policy adopted in December 1996 covers both Headquarters and Area Office administrative shares. Therefore, it appears that the Secretary's preferred course is to award the full amount of the Headquarters Office administrative shares, but defer release for a reasonable period of time to permit orderly liquidation of encumbered assets, as with the Area Office administrative shares. That is not what happened here. Although a deferral of payment for a reasonable time may be permitted under the ISDEA, declining to pay any Headquarters Office administrative shares is expressly prohibited. Therefore, the Shoshone–Bannock Tribes are entitled to summary judgment on the Eighth Claim, and defendants must immediately award the appropriate Headquarters administrative shares for the Tribal Contract Shares Proposal to the Shoshone–Bannock Tribes.

## VIII. *FAILING TO PAY CONTRACT SUPPORT COSTS (Ninth & Tenth Claims)*

■ The Ninth and Tenth Claims allege that defendants violated 25 U.S.C. § 450j–1(a)(2) and (g) by failing to provide contract support costs ("CSC") funding for the Tribal Shares Contract Proposal. Specifically, these claims allege violations for: (1) the awarded and approved portions of the proposals; (2) the declined portions of the proposals; and (3) the approved but unawarded portions of the proposals.

The CSC are:

the reasonable costs for activities which must be carried on by a tribal organization as a contractor to ensure compliance with the terms of the contract and prudent management, but which—

(A) normally are not carried on by the respective Secretary in his direct operation of the program; or

(B) are provided by the Secretary in support of the contracted program from resources other than those under contract.

25 U.S.C. § 450j–1(a)(2).

As with the Secretarial Amount, the full amount of CSC funds must be added to the contract "[u]pon the approval of a self-determination contract." 25 U.S.C. § 450j–1(g). CSC are automatically awarded as a percentage of the tribe's Secretarial Amount, but funding "is subject to the availability of appropriations" and the Secretary's need to continue to serve non-contracting tribes. 25 U.S.C. § 450j–1(b).

In 1992, IHS began to address CSC funding through an unpromulgated, internal agency guideline named the Indian Self–Determination Memorandum ("ISDM") 92–2 ("Contract Support Cost Policy").[14] Plaintiff's Exhibit 12. The ISDM in part explained how CSC needs were to be calculated. It also limits a tribal contractor's right to CSC funds associated with "new and expanded contracts" to the amount of funding IHS has available in its "ISD Fund:"

Funds for new and expanded contracts [covering CSC] will be allocated by IHS Headquarters from the ISD fund on a monthly basis until expended. If permitted by appropriations act, any funds that remain at the end of the fiscal year will be added to any ISD funds available in the subsequent year. If funds are exhausted at any point in the fiscal year, requests received thereafter will be considered first for funding in the subsequent year from funds appropriated for this purpose.

\* \* \* \* \* \*

If funds from the ISD Fund are inadequate to fully fund all requests, then requests to be funded that month will be selected based on the earliest receipt date.

Plaintiff's Exhibit 12, pp. 5–6.

If the CSC need is greater than the available funds, "the available amount will be the basis for consideration of approval or declination of proposals" and "deficiencies for existing contracts will be included in the annual report to Congress required by Section 106(c)" of the ISDEA. *Id* at 5.

By 1995 the annual demand for CSC funds for new and expanded contracts began to exceed the limited $7.5 million that IHS made available in its "ISD Fund," leading IHS to establish a Priority List. Plaintiff's Exhibit 13. That Priority List ranks CSC requests by contract start date. *Id.* Each year IHS pays CSC funds only to those tribes appearing at the top of the list for that year. *Id.* As of March 30, 1996, the requests in the ISD queue totaled over $25 million, more than triple the amount available in the ISD fund. *Id* at 3. The net effect is that tribes are never paid CSC funds for prior years and the Priority List has grown. Consequently, tribes such as the Shoshone–Bannock are operating programs for years without receiving any of the CSC to which they are entitled under the ISDEA.

The Partial Declination Letter agreed that the Shoshone–Bannock Tribes are entitled to CSC to the full extent allowed by the ISDEA, but that their request would be placed on the Priority List under ISDM 92–2. Plaintiff's Exhibit 3, p. 1, n. 1. After further negotiations broke down, the Secretary included the following footnote to amendment

---

14. ISDM 92–2 was recently superseded by IHS Circular No. 96–04, which communicates essentially the same interpretation and policy. Defendants' Exhibit J.

number two to the "approved" portions of the Tribal Contract Share Proposal:

> The tribes believe that § 106(a)(2) [§ 450j–1(a)(2)] requires IHS to immediately pay CSC. IHS believes that payment of CSC in the manner described in ISDM 92–2 or it's [sic] successor is consistent with the provisions of § 106(a)(2).

Plaintiff's Exhibit 8, p. 7, n. 26.

The Shoshone–Bannock Tribes have received no payment for any requested CSC funds in FY 1996 or FY 1997. As of April 22, 1996, their CSC requests for the PHN and Tribal Shares Contract Proposals were placed 44th and 53rd on the Priority List, leaving them unlikely to receive their CSC funds for many more years. Although they do not contest their rankings on the Priority List, the Shoshone–Bannock Tribes contend that the entire Priority List is unnecessary and illegal under the ISDEA.

Defendants blame this state of affairs on the lack of sufficient appropriations to fund all CSC requests and justify the Priority List by invoking the ISDEA's provision that all funding is "subject to the availability of appropriations." 25 U.S.C. § 450j–1(b). This dispute is similar to the ageless question of which came first, the chicken or the egg? In this case, the question is which came first, the tribes' CSC requests or the ISD Fund? The Shoshone–Bannock Tribes argue that their CSC requests come first and that the ISD Fund should be increased sufficiently to pay them, while defendants argue that the ISD Fund comes first and sets a limit on the amount of funding available for CSC.

The total IHS appropriation in FY 1996 was $1.7 billion, which is more than sufficient to cover all CSC requests for that year, assuming no other programs had priority for funding. However, of that lump sum appropriation, Congress recommended that $153,-040,000 be appropriated for existing CSC and that $7.5 million be appropriated for CSC for new self-determination contracts. Defendants' Exhibit K, Dept. of the Interior And Related Agencies Appropriation Bill, 1996, H.R.104–173, at 97. Although not requiring such an allocation, the Omnibus Consolidated

Rescissions and Appropriations Act of 1996, PubL No 104–134, 110 Stat 1321 (1996),[15] specifically provided that of the lump sum appropriation:

> $7,500,000 shall remain available until expended, for the Indian Self–Determination Fund, which shall be available for the transitional costs of initial or expanded tribal contracts, grants or cooperative agreements with the Indian Health Service under the provisions of the [ISDEA].

The parties agree that this appropriation of $7.5 million for the ISD Fund is not an "earmark" or cap on the amount the Secretary can pay for CSC, but is intended to segregate such funds for "no year" status which has no fiscal year limitation or expiration date. However, the Secretary argues that she cannot be forced to reach into IHS' lump sum appropriation to make new CSC payments over and above the $7.5 million ISD Fund. Instead, she claims that she has the discretion to use all available funds to pay CSC, as well as the discretion not to reduce funding for other programs or services to other tribes in order to pay the Shoshone–Bannock Tribes' CSC.

The question is the extent of IHS' ability to allocate funding between various ISDEA services and programs. Defendants rely on *Lincoln v. Vigil,* 508 U.S. 182, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), to argue that its allocation of insufficient appropriations is committed to agency discretion. Based on an analysis of the Snyder Act, 25 U.S.C. § 13, and the Indian Health Care Improvement Act, 25 U.S.C. § 1601 *et seq,* the Supreme Court held in *Lincoln,* 508 U.S. at 192, 113 S.Ct. at 2031, that Congress had delegated to IHS the unreviewable discretion to reallocate funds included in a lump sum appropriation:

> The allocation of funds from a lump sum appropriation is another administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statu-

---

**15.** The FY 1997 Appropriations Act is nearly identical to the FY 1996 Act except that Congress increased IHS' lump sum appropriation by near-ly $60 million to $1,809,269,000. Omnibus Consolidated Appropriations Act for FY 1997, PubL No 104–208, 110 Stat 3009 (Sept. 30, 1996).

tory responsibilities in what it sees as the most effective or desirable way.

Unless it violates a restriction in the operative appropriation statutes, an agency "is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities," such as:

whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources" to fund a program "at all."

*Id.* at 193, 113 S.Ct. at 2031, quoting *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

The Supreme Court concluded that, absent any statutory restriction or requirement to fund individual Indian programs, IHS could permissibly exercise its discretion to discontinue funding of the Indian Children's Program providing direct clinical services to handicapped Indian children in the Southwest in order to establish a nationwide treatment program.

*Lincoln* is not particularly helpful because it involves different statutes and a different issue. *Lincoln* addressed a truly discretionary program, the Indian Children's Program, for which Congress had "never authorized or appropriated monies expressly." *Id.,* 508 U.S. at 184, 113 S.Ct. at 2028. IHS had for years funded that program out of the annual lump-sum allotment without any specific directive from Congress. In contrast, the ISDEA sharply limits the Secretary's discretion and requires full funding of CSC subject only to the availability of appropriations and the need to continue to provide services to non-contracting tribes.

One court has specifically analyzed the ISDEA with respect to the allocation of CSC by another agency, the Bureau of Indian Affairs, as a result of a CSC funding shortfall caused by a statutory cap. In *Ramah Navajo School Bd., Inc.,* 87 F.3d at 1345, the District of Columbia Circuit interpreted the "subject to the availability of appropriations" proviso as follows:

Given the mandatory terms of the Tribes' [CSC] entitlement under the Act, Congress clearly included the provision not to excuse the Secretary's obligation to follow the mandates of the statute, but rather to make evident that the Secretary is not required to distribute money if Congress does not allocate that money to him under the Act.... Thus, if the money is not available, it need not be provided, despite a Tribe's claim that the [ISDEA] "entitles" it to the funds ...

Even though the [ISDEA] speaks of a Tribe's "entitlement" to certain funds, the Secretary cannot be forced to take money from a program serving a Tribe (for example, from one of the federally-funded "programs" for which [CSC] is to cover administrative costs) in order to make up for a [CSC] appropriations shortfall.

Thus, we read the subject-to-availability-of-funds provision to mean precisely what it says: the Secretary need only distribute the amount of money appropriated by Congress under the Act, and need not take money intended to serve non-[CSC] purposes under the [ISDEA] in order to meet his responsibility to allocate [CSC].

However, an appropriation shortfall cannot be used to enlarge the agency's discretion to decide which projects to fund. "Congress never intended to commit the allocation of [CSC], full or partial, to agency discretion." *Id.* at 1349. Instead, an agency is obligated "to follow as closely as possible the allocation plan Congress designed in anticipation of full funding." *Id.* at 1348. Because the legislative history revealed the intent of the 1995 Congress to a *pro rata* reduction, the court held that the Secretary violated the ISDEA by promulgating new allocation rules.

Here no statutory minimum or maximum was placed on CSC funding. The Secretary simply decided that, pursuant to recommendation of the Committee Report, $7.5 million was an appropriate sum to be allocated to new CSC for FY 1996. The Priority List was deemed by the Secretary to be preferable to a *pro rata* allocation of CSC, otherwise the funding would be insufficient for any tribe to get started.

However, the tentative budget allotment between existing and new CSC relied upon

by the Secretary was not carried into the language of the 1996 Appropriations Act. Thus, no statute expressly restricts the Secretary's ability to shift funds within its general appropriations to pay CSC. Although the Secretary need not take funds from on-going programs or services to fund CSC, she is certainly required to fund CSC with available appropriated funds before undertaking new discretionary projects or initiatives or permitting funds to lapse to the Treasury. However, defendants have presented no evidence one way or the other as to how available funds for FY 1996 were used or whether IHS could have paid the CSC for FY 1996 without in any way restricting her other discretionary funding initiatives.

The Shoshone–Bannock Tribes suspect that IHS had substantial unobligated balances carried over from one year to the next in its general "no year" account (# 75X0390). Plaintiff's Exhibits 14–19. However, defendants have explained that all of the funds in the "no year" account have specific statutory restrictions that they only be expended in future years for their original purpose. For example, since Congress specifically earmarked $12 million for the Catastrophic Health Program in FY 1996 without fiscal year limitation, IHS cannot spend those funds in any future year for CSC. *See* 25 U.S.C. § 1621a. Similarly, IHS cannot spend unobligated balances in fixed year appropriations for purposes other than those for which they were originally obligated. National Defense Authorization Act for Fiscal Year 1991, PubL 101–510, 104 Stat 1485, 1675, 31 U.S.C. §§ 1551–1557.

Nevertheless, under the declination criteria in 25 U.S.C. § 450f(a)(2), it is not the Shoshone–Bannock Tribes' responsibility to prove that funds were available to fully pay their CSC request without adversely affecting other tribes. Rather, it is defendants' burden to "clearly demonstrate" that such funding was unavailable. Permitting IHS to first allocate a certain amount of funding from its lump sum appropriation for CSC and then deny CSC funding if the requests exceed the allocation would create an enormous loophole, granting the Secretary nearly unfettered discretion to determine when appropriated funds are available. That methodology clearly violates the ISDEA. In-

stead, the Secretary should receive the CSC requests for each fiscal year and then try to allocate as much funding as possible from the lump sum appropriation for that year to pay those requests. The end result ultimately may be the same if, in fact, the Secretary cannot possibly allocate any additional funds to pay CSC because of the competing needs for funding on-going programs and services to other tribes. However, the result cannot dictate the means, given Congress' deep suspicion of IHS.

█ Furthermore, the ISDM 92–2 violates IHS' own interpretation of the 1996 Appropriations Act by permitting use of the ISD Fund to pay for costs and expenses that are not "transitional costs" (termed "start-up" costs under 25 U.S.C. § 450j–1(a)(5)) of new self-determination contracts. The memorandum allows payment for "recurring direct" CSC and other "indirect" CSC which, by definition, are not "start-up" costs, but are ongoing costs. The Secretary should have used the ISD Fund to cover only tribal "transitional costs" for new contracts, and used the lump sum appropriation to cover all other CSC for new contracting tribes, as is done to pay CSC needs of ongoing tribal contracts.

Finally, the IHS' budget documents seemingly reveal that it has not consistently adhered to even its own dictates in ISDM 92–2 that all CSC funding for new or expanded contracts must be drawn from the ISD Fund (or even the # 75X0390 "no-year" account which includes the ISD Fund). At least four funding allocation documents indicate that two tribes received over $600,000 in CSC funding from the annual lump-sum account (# 7540390), not the ISD Fund. Plaintiff's Exhibits 20–23. Conversely, it appears that over $500,000 was paid from the ISD Fund to settle a lawsuit without specifying that the money was in fact for CSC. Plaintiff's Exhibits 24–25.

█ Therefore, as a matter of law based on undisputed facts, this court concludes that defendants violated the ISDEA by relying on the ISDM 92–2 to deny CSC funding to the Shoshone–Bannock Tribes in FY 1996 and are not entitled to summary judgment on the Ninth and Tenth Claims. However, it is not

clear whether the Shoshone–Bannock Tribes are entitled to summary judgment in their favor to force payment of their requested CSC for FY 1996. The record contains no evidence as to whether or not sufficient appropriated funds are available to pay CSC to the Shoshone–Bannock Tribes. Again, it is the Secretary's burden to clearly demonstrate that IHS cannot possibly allocate any additional funds to pay CSC. And once again, given the inadequacy of the record on this issue, this court prefers the cautious approach of holding a hearing to permit the parties to fully develop the record.

## IX. *CONCLUSION*

For the foregoing reasons, the First, Second, Third and Fifth Claims are dismissed without prejudice; defendants are granted summary judgment on the Seventh Claim; and the Shoshone–Bannock Tribes are entitled to a declaratory judgment and permanent injunction on the Eighth Claim requiring defendants to award the Headquarters' administrative share. The remaining claims (Fourth, Sixth, Ninth and Tenth Claims) will be scheduled for a hearing.

### ORDER

For the reasons stated in the accompanying Opinion:

1. Plaintiff's First, Second, Third and Fifth Claims are dismissed without prejudice;

2. Plaintiff's Motion for Partial Summary Judgment (docket # 30) is granted in part and denied in part as follows:

 a. GRANTED as to the Eighth Claim; and

 b. DENIED as to the Fourth, Sixth, Seventh, Ninth and Tenth Claims.

3. Defendants' cross Motion for Summary Judgment (docket # 37) is granted in part and denied in part as follows:

 a. DENIED as moot as to the First, Second, Third, and Fifth Claims;

 b. GRANTED as to the Seventh Claim; and

 c. DENIED as to the Fourth, Sixth, Eighth, Ninth and Tenth Claims.

Accordingly:

1. On the Seventh Claim, defendants are entitled to entry of judgment in their favor;

2. On the Eighth Claim, plaintiff is entitled to entry of a judgment in its favor declaring that defendants' declination to award the Headquarters Office portion of the Tribal Shares Contract Proposal for FY 1996 violates 25 U.S.C. §§ 450f(a), 450j–1(a), (b) and (g), and is entitled to a permanent injunction requiring defendants to award the appropriate amount. The issues of the appropriate amount, any monetary damages, prejudgment interest, and costs of suit, including attorney fees, remain pending; and

3. The Fourth, Sixth, Ninth and Tenth Claims will be set for an evidentiary hearing.